UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MUHAMMAD AL-LAMADANI,                    :          No. 1:13-cv-00322
                                         :
          Plaintiff,                     :
                                         :
                                         :
          vs.                            :          **OPINION AND ORDER**
                                         :
VILLAGE OF INDIAN HILL, et al.,          :
                                         :
          Defendants.                    :

     This matter is before the Court on Defendants Village of
Indian Hill and Officer Keith Lang's Motion for Summary Judgment
(doc. 27), Plaintiff's response in opposition (doc. 33) and
Defendants' reply (doc. 37). For the reasons that follow,
Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

## I. Background

     The particulars of this cause of action are relatively
straightforward, involving a single incident that occurred in
the late evening of May 25, 2011. Plaintiff Muhammad Al-
Lamadani was then (and remains) an executive with General
Electric whose professional responsibilities require lengthy
stays abroad.[1] In the two weeks or so prior to May 25th, he
tried unsuccessfully to reach his wife of more than 30 years,

---

[1] On May 25, 2011, Plaintiff was General Electric's Chief
Executive of Sales and a Vice President in its International
Division. Currently, he serves as its Vice President of
International Trade in Europe and the Middle East. (Deposition
of Plaintiff Muhammad Al-Lamadani, doc. 22 at 21.)

Ruby Kathryn Al-Lamadani, by telephone "several times[]" (Deposition of Plaintiff Muhammad Al-Lamadani, doc. 22 at 40). Plaintiff became "pretty concerned and worried" especially when their adult daughter, Laila, confirmed that neither she nor her sister, Nadia, both of them then living in Florida, had spoken with their mother (Plaintiff's dep. at 18-19, 40-41). He even contacted Mrs. Al-Lamadani's son from her first marriage who lives in Springfield, Missouri, in the hopes that she might have been visiting there. With no explanation for her absence, Plaintiff booked a flight from London to Cincinnati. (Plaintiff's dep. at 41.) He landed at approximately 10:30 p.m. that particular evening, rented a car and then drove to his Indian Hill residence at 5605 Pamlico Lane, a home that he had shared with his wife since April 1986. (Plaintiff's dep. at 13-16, 45, 47.)

Upon arriving, Plaintiff attempted to enter his home through its front door. Supposing it must have been "locked from the inside[,]" he knocked—because their doorbell had never worked—to no avail. (Plaintiff's dep. at 47-49.) Plaintiff walked around to a back screen door that was unlatched. He entered his home, saw his wife (and the family cat) asleep on the couch in the living room and tried to wake her. When Mrs. Al-Lamadani awoke, she twice asked her husband what he was doing there. Thinking she was dreaming, he told her, "[I]t's me[.]"

She then repeatedly told him to "[G]et out of here[!]" Plaintiff, quite confused, asked her, "[W]hat did I do?" (Plaintiff's dep. at 50-52.) Mrs. Al-Lamadani's responded that she was going to call the police. (Plaintiff's dep. at 52-54.) Plaintiff sat—in shock—on a chair in their living room next to a window; so positioned, he was visible to anyone approaching the front door. (Plaintiff's dep. at 74-76; Deposition of Defendant Keith Allen Lang, doc. 25 at 12, 17, 28; Deposition of Raymond Manning, doc. 26 at 22.) He observed his wife talking on the telephone, and she did not appear to him to be visibly shaken or upset; however, he could not hear any of the statements she made to the 911 operator because she was "not talking loud[]" (Plaintiff's dep. at 56, 69-70).

Defendant Keith Lang of the Indian Hill Rangers was dispatched to the Pamlico Lane residence at 11:23 p.m., arriving two minutes later. Officer Raymond Manning similarly was dispatched arriving three minutes after Officer Lang. (Lang dep. at 13-14; Manning dep. Exh. 4.) Mrs. Al-Lamadani met Officer Lang on the front stoop. She told him that she had awoken to her husband standing over her and was "mad" at herself for leaving the back door unlocked (Lang dep. at 15-16). She stated further that she had a restraining order against her husband, but she did not know if he had been served with it yet (Lang dep. at 18). Mrs. Al-Lamadani acknowledged that her

3

husband had not harmed her that evening, but she advised Officer Lang that he had been violent toward her in the past (Lang dep. at 16-17).

Upon Officer Manning's arrival, Officer Lang entered the residence. He did not see any weapons (Lang dep. at 32, 52). Officer Lang ordered Plaintiff to "get up, get up, turn around, turn around" (Plaintiff's dep. at 80; Lang dep. at 23). Plaintiff complied, but asked "[W]hat did I do?" (Plaintiff's dep. at 80-82). Officer Lang then ordered Plaintiff to put his hands behind his back to be handcuffed. Again, Plaintiff complied, but asked, "What did I do?" Officer Lang replied, "shut up, shut up, and turn around." He struck Plaintiff on the back of his head and on his back. He then handcuffed Plaintiff and emptied his pockets, told him to take off his shoes, patted him down and asked if he had any weapons on his person. Plaintiff responded that he "never owned a gun in [his] life." (Plaintiff's dep. at 71, 80-81.) Officer Lang then asked if there were any guns in the house. Plaintiff replied, "[W]e have never owned a gun, never have had a gun in the house. I have never ever used a weapon in my life." (Plaintiff's dep. at 88.)

In the process of placing the handcuffs on Plaintiff, Officer Lang remarked, "[Y]our hands seems to be very stiff[]" (Plaintiff's dep. at 84-88). Plaintiff again asked why he was being handcuffed, to which Officer Lang replied, "You people

4

don't hear.  You people don't understand." (Plaintiff's dep. at 94 (emphasis added).)  According to Plaintiff, the degradation continued (Plaintiff's dep. at 94).  Plaintiff was directed to sit back down in the chair where he had been previously sitting. When he complained that the handcuffs were hurting him, Officer Lang responded, "handcuffs always hurt," and did nothing to loosen them (Lang dep. at 30-32).

Soon thereafter, Plaintiff was advised by Officer Manning—for the first time—that there was a restraining order against him.  His reaction:  "I said, show me.  I said, I didn't know. I didn't know, what is a restraining order?" (Plaintiff's dep. at 97).  Eventually Officer Manning showed Plaintiff a copy of the restraining order, to which he countered, "I've never seen this in my life[]" (Plaintiff's dep. at 99).  Officer Manning called the Hamilton County Clerk of Court's 24-hour line to learn whether Plaintiff had been served with a copy of the restraining order.  According to Officer Manning, "They could not find that it had been served or even issued.  They couldn't find any paperwork on it at all[]" (Manning dep. at 39). Officer Manning so informed Officer Lang, who then removed the handcuffs (Manning dep. at 41-42).  Plaintiff was then told to "get out of the house[]" (Plaintiff's dep. at 99).  Officer Lang followed Plaintiff out to his rental car, pointed his finger at him "like [a] dog" and told him, "don't you ever come to this

5

house again, you understand?" (Plaintiff's dep. at 99-100, 105-06.)

Plaintiff has sued the Village of Indian Hill and Officer Lang in his individual capacity. He originally alleged two claims—brought pursuant to 42 U.S.C. §1983—in violation of the Fourth and Fourteenth Amendments, unlawful search (Count One) and use of excessive force (Count Two). As indicated, Defendants have moved for summary judgment, and the motion is ripe. Plaintiff concedes the merits of Defendants' argument with regard to his unlawful search claim and has abandoned it (see doc. 33 at 4-6). However, he opposes Defendants' motion as it relates to his unlawful seizure and excessive force claim. He maintains that he suffered a minor physical injury and continues to suffer emotional injury as a result of being handcuffed (Plaintiff's dep. at 109-22). Thus we proceed.

## II. Legal Standard

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled. First, "a party seeking summary judgment always bears the initial responsibility of informing

6

the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993). This burden may be satisfied, however, by the movant "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial. Celotex, 477 U.S. at 331-32. As "the requirement [of the Rule] is that there be no genuine issue of material fact," the Supreme Court has made clear that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis in original). Ancillary factual disputes, those "that are irrelevant or unnecessary[,] will not be counted." Id. Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position

will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252. Instead, the opposing party must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Companies, Inc., 8 F.3d 335, 339-40 (6th Cir. 1993) (applying Anderson, 477 U.S. at 249-50; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

At this summary judgment stage, it is not our role "to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In so doing, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-59 (1970) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962))). Adherence to this standard, however, does not permit us to assess the credibility of witnesses. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994) (citing Anderson, 477 U.S. at 255)).

## III. Discussion

### A. The Right to Detain

Justice Kennedy begins the Supreme Court's analysis in Bailey v. United States with this abridged lesson in Fourth Amendment jurisprudence, an appropriate launch for our analysis of the circumstances at bar.

> The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. A search may be of a person, a thing, or a place. So too a seizure may be of a person, a thing, or even a place. A search or a seizure may occur singly or in combination, and in differing sequence. In some cases the validity of one determines the validity of the other. The instant case involves the search of a place . . . and the seizure of a person. But here, though it is acknowledged that the search was lawful, it does not follow that the seizure was lawful as well. The seizure of the person is quite in question.

133 S. Ct. 1031, 1035 (2013) (emphasis added).  As in Bailey, very much "in question" here is whether Officer Lang's seizure of Plaintiff in his living room was lawful.  This Court has read cover-to-cover the transcripts of the depositions previously cited, and viewed in its entirety the video of Plaintiff's deposition, and listened multiple times to the audio of the 911 emergency call placed by Mrs. Al-Lamadani and the concomitant radio transmission/dispatch recordings.  Without reservation we conclude that there exist genuine issues of material fact such that Defendants are not entitled to judgment as a matter of law on this issue.

9

It is well-settled that whether probable cause exists to detain (or arrest) is not a black and white test.

> The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty. The Supreme Court has made clear that there is no precise formula for determining the existence or nonexistence of probable cause; rather, a reviewing court is to take into account the "factual and practical considerations of everyday life" that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred or is about to occur. See Illinois v. Gates, 462 U.S. 213, 231 (1983). There is, of course, a requirement that the officers be able to articulate concrete facts from which they infer a probability that illegality has occurred. As we have consistently emphasized, however, while officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt. See, e.g., United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990).
>
> The real question, then, is this: at what point does a body of evidence amassed by a police officer against a particular suspect cross the line from merely raising a suspicion to establishing probable cause? . . . To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspect's illegal conduct. Instead, we need only consider whether there are facts that, given the "factual and practical considerations of everyday life," could lead a reasonable person to believe that an illegal act has occurred or is about to occur. See Gates, 462 U.S. at 231.

Scott v. City of Bexley, 11 Fed. App'x 514, 518 (6th Cir. 2001) (quoting United States v. Strickland, 144 F.3d 412, 415–16 (6th Cir. 1998) (footnotes omitted)) (emphasis added). And whether probable cause exists typically is a jury question "unless there is only one reasonable determination possible." Scott, 11 Fed. App'x at 518 (citing Pyles v. Raisor, 60 F.3d 1211, 1215 (6th

10

Cir. 1995)). The facts adduced during discovery, now on record before this Court, categorically preclude Defendants from meeting this standard.

When asked to recite the factors that led him to handcuff Plaintiff, Officer Lang responded as follows:

> A. 911 call from a person [Mrs. Al-Lamadani] stating that he [Plaintiff] was in violation of a protection order or restraining order. On arrival she was very upset and scared. She had advised he had been violent in the past and his actions at the time were very strange based on my experience, very strange for when police first come to the house. Right off the bat you could tell he wasn't in a -- he wasn't friendly, you know, in any means. He wasn't coming out to greet us or anything like that. Very strange. Sitting in the seat staring straight ahead.
>
> Q. Those are the factors?
>
> A. And the fact that we didn't know if he had any weapons. We didn't or she didn't know if he had any weapons on him so he had the possibility of being armed.

(Lang dep. at 50-51.) In the Court's view, a trier of fact easily could determine these reasons insufficient. Prior to his arrival, the 911 dispatcher advised Officer Lang that there was "not a lot of activity" going on at the residence, with the complainant stating that her husband was "just watching" her, "not saying or doing anything[]." Officer Lang also was advised that it was "unknown if the subject is armed[,]" not that the subject told his wife outright that he "had" a weapon, or that she believed he "might have" a weapon, or that his wife "knew he owned" a weapon, or that he "used a weapon against her on prior

occasions[]."   The  difference,  we  believe,  is  more  than semantics  or  nuance,  as  the  picture  Officer  Lang  attempts  to paint is one of crisis.

Upon  arrival,  Mrs.  Al-Lamadani  told  Officer  Lang  about  the protection  order  and  told  him  that  her  husband  may  not  have  yet been  served  with  it.   She  explained  that  she  thought  he  was  in London  and,  while  she  had  changed  the  locks  on  their  residence, he  obviously  entered  through  the  back  screen  doors  that  she, herself,  had  left  unlatched.   Thus,  Plaintiff  had  not  engaged  in any  destructive  behavior  in  order  to  gain  entrance  to  his  home. Officer  Lang  testified  that  Mrs.  Al-Lamadani  told  him  she  was afraid  of  her  husband  and  that  he  had  been  violent  in  the  past. He  unconditionally  took  her  at  her  word,  asking  for  no  details as  to  how  or  when  Plaintiff  had  been  abusive  toward  her  on  prior occasions.   Yet  Mrs.  Al-Lamadani  confirmed  that  Plaintiff  had not  harmed  her  thus  far  that  evening.   The  entire  time  they  were talking  Officer  Lang  could  see  Plaintiff  sitting  quietly  in  the living  room.   That  he  found  Plaintiff's  demeanor  to  be  "strange" or  "weird"  does  not  inescapably  translate  into  "dangerous". Both  Officer  Lang  and  Officer  Manning  concede  that  there  were  no weapons  in  sight,  either  on  Plaintiff's  person  or  within  his reach.   Moreover,  it  was  clear  that  Mrs.  Al-Lamadani  had  the freedom to exit the house.

Officer Lang testified that he believes he saw a copy of the ex parte restraining order—faxed earlier that day to the Indian Hill Rangers by Mrs. Al-Lamadani's divorce attorney—at the beginning of his shift (Lang dep. at 18-19). He did not ask to see Mrs. Al-Lamadani's copy once on the premises, but he did "talk [with her] about I guess she just had filed it that morning[]" (Lang dep. at 18). Against this background, knowing that Plaintiff had not been served with the order, Officer Lang instructed him to "get up[,]" "turn around[,]" "shut up[,]" and be handcuffed. At no point prior to being handcuffed was Plaintiff told that he was in violation of a civil protection order. At no point prior to being handcuffed was Plaintiff asked his side of the story (see, e.g., Manning dep. at 33).

All these "factual and practical considerations" suggest that a reasonable person might find Officer Lang's actions to have been grounded purely on "mere suspicion" or, worse, even appearance and stereotype. Plaintiff testified that—once handcuffed—Officer Lang degraded him, beginning his taunts with "You people don't hear. You people don't understand." It will be up to the trier of fact to assess Plaintiff's credibility on this point and what, if anything, Officer Lang might have meant by such a pejorative label. The Court notes that Plaintiff is a native of the kingdom of Jordan (Plaintiff's dep. at 15).

Further, having watched and listened to his deposition testimony, it is obvious that Plaintiff looks foreign-born and speaks with a pronounced accent, although with precision and clarity. Little in the record describes Mrs. Al-Lamadani's background, but a trier of fact listening to her voice on the 911 audio might conclude that she, unlike her ex-husband, is American-born. Additionally, the "Incident/Offense Report" on which Officer Frank Cogliano of the Indian Hill Rangers noted receipt of the protection order lists Mrs. Al-Lamadani's race as "W", which presumably is an abbreviation for "White" (Deposition of Frank Cogliano, doc. 35 Exh. 2 at 1). This Court acknowledges the precedent allowing a police officer to secure a situation that he reasonably believes places himself at risk or otherwise has the potential for violence. Yet it would be constitutionally impermissible for that police officer to assume, without more, that an individual with a "Middle Eastern" national origin—who is not "White"—is more likely to be aggressive. Thus, we determine that there exist genuine issues of material fact with regard to whether Officer Lang indeed had probable cause to immediately detain Plaintiff in order to contain a crisis or whether he unreasonably overreacted in violation of the Fourth Amendment.

**B. Use of Excessive Force with Handcuffs**

It is well-established in this circuit that an individual can maintain a Fourth Amendment claim for "unduly tight or excessively forceful handcuffing during the course of a seizure." Morrison v. Bd. of Trustees of Green Twp., 583 F.3d 394, 401 (6th Cir. 2009) (citing Kostrzewa v. City of Troy, 247 F.3d 633, 639 (6th Cir. 2001)). A handcuffing claim survives summary judgment only when there is adequate evidence to create a material fact as to the following elements: (1) the plaintiff complained that the cuffs were too tight; (2) the defendant police officer ignored the complaint; and (3) the plaintiff suffered "some physical injury" as a consequence. Morrison, 583 F.3d at 401 (citing Lyons v. City of Xenia, 417 F.3d 565, 575-76 (6th Cir. 2005)). Plaintiff establishes all three. It is undisputed that Plaintiff protested.[2] Moreover, Officer Lang effectively conceded he did nothing in response:

> A. He talked about the handcuffs were hurting him and I said handcuffs always hurt. I think I told him – we've been handcuffed a lot during training, and, yeah it does hurt, but there's plenty of room in your cuffs.
>
> Q. When he told you the handcuffs were hurting, did you loosen them?
>
> A. I don't know if I checked them . . . .
>
> . . . .

---

[2] This Court does not read Morrison to require a specific request to loosen the handcuffs as well as a complaint that they are too tight; the latter is sufficient.

    Q.  You  put  them  on  originally,  stuck  your  pinky  in
between  his  wrist  between  the  edge  of  the  cuff,  found  there
was  room  and  double-locked  them?

    . . . .

    A.  Yes.

    Q.  And  then  afterwards  he  complained  about  the  fact  that
they  were  too  tight  and  hurt  him?

    A.  Yes.


    Q.  What  did  you  do  in  response?

    A.  I don't know if I checked them, had  him  stand  up  to
check  them  again  or  I  just  told  him  they  were  fine.   I  put
them  on.   They're  loose.   It's  just  handcuffs  hurt.

(Lang dep. at 30-32 (emphasis added).)   Finally, in addition to

discomfort,  Plaintiff  suffered  a  "red  mark"  on  his  left  wrist

that  turned  "a  little  blue"  and  was  gone  the  next  day

(Plaintiff's  dep.  at  109-10),  fundamentally  the  same  injury

experienced by Amanda Morrison.   See Morrison, 583 F.3d at 398.

That Plaintiff's injury wholly resolved the next day without the

benefit  of  medical  treatment  is  relevant  to  an  award  of  damages,

but  not  to  a  finding  of  liability,  assuming,  of  course,  a  trier

of fact credits his testimony.


        C. Qualified Immunity

    In Hafer v. Melo, the Supreme Court reviewed and clarified

the distinction between official- and personal (or individual)-

capacity suits  brought  under  42  U.S.C.  §  1983.   Official-

capacity  suits  "'"generally  represent  only  another  way  of

pleading an action against an entity of which an officer is an agent."'" 502 U.S. 21, 25 (quoting Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. New York City Dep't of Social Services, 436 U.S. 658, 690 n.55 (1978))). Personal-capacity suits, in contrast, "seek to impose individual liability upon a government officer for actions taken under color of state law." Hafer, 502 U.S. at 25. Personal liability is established when "'the official, acting under color of state law, caused the deprivation of a federal right.'" Id. (quoting Graham, 473 U.S. at 166). Tie to a "policy or custom" need not be proved by a plaintiff, and an official sued in his personal capacity may "assert personal immunity defenses such as objectively reasonable reliance on existing law." Hafer, 502 U.S. at 25 (citing Graham, 473 U.S. at 166-67).

The doctrine of qualified immunity thus would protect Officer Lang, as an Indian Hill Ranger sued in his personal (or individual) capacity (see doc. 1 ¶ 3), "'from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is "'an immunity from suit rather than a mere defense to liability.'" Id. (quoting

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis original)). Prior to the Supreme Court's decision in Pearson, a two-tiered analysis was required, beginning with this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). If the answer to that initial inquiry is negative, immunity attaches. If not, "[and] a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. Pearson ruled that following Saucier's "two-step protocol" is not mandatory, but remains permissible. 555 U.S. at 821. A lower court, in its discretion, now may consider the second question first if it believes such a path "will best facilitate the fair and efficient disposition" of the case before it. We still are at liberty, however, to follow the Saucier-prescribed sequence if we find it "worthwhile." Id.

Officer Lang concedes, as he must, that it is clearly established that an arrest without probable cause violates the Fourth Amendment. He likewise concedes that it is clearly established that the Fourth Amendment prohibits unduly tight or excessively forceful handcuffing. Nonetheless, he urges that no

reasonable officer in his position would have believed that handcuffing and detaining Plaintiff—in response to a 911 call in which is wife stated that he was in her home in breach of a protection order—was unlawful. The totality of the circumstances here prompt this Court to disagree, as we determine that whether Officer Lang acted reasonably depends on questions of fact which only a jury is privileged to resolve.

Officer Lang relies heavily on the well-founded concern of officer safety. Yet the 911 operator advised that there was "not a lot of activity going on" at the residence. Officer Lang arrived within two minutes of being dispatched; Plaintiff was in plain sight, sitting quietly in the living room. No weapons were in sight. A trier of fact might conclude that Plaintiff posed <u>no</u> threat, much less an immediate one, to either Mrs. Al-Lamadani or the first responders and that the precaution of handcuffing was not indicated. Officer Lang testified that he believes he saw the just-docketed civil protection order prior to beginning his shift that evening. He also testified that Mrs. Al-Lamadani told him—before he entered the residence and approached Plaintiff—that, because she thought her husband still was in London, he probably had not been served with the order that had been entered that very morning. Proper service, of course, is a "bedrock" principle of due process. <u>Murphy Bros.,</u>

Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 347, 351 (1999); see Friedman v. Estate of Presser, 929 F.2d 1151, 1156 (6th Cir. 1991) ("[T]he requirement of proper service of process 'is not some mindless technicality.'" (quoting Del Raine v. Carlson, 826 F.2d 698, 704 (7th Cir. 1987)). Officers Lang and Manning obviously were aware of this critical tenet of civil procedure as Plaintiff was instantly released once they confirmed with the Hamilton County Clerk that Plaintiff indeed had not yet been served. A trier of fact, therefore, might conclude that a reasonable officer, under the totality of these circumstances, would have proceeded differently in deference to Plaintiff's constitutional guarantees. Accordingly, summary judgment on the basis of qualified immunity is improper. See Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007).

### D. Liability of Defendant Village of Indian Hill

Plaintiff may not sue the Village of Indian Hill under Section 1983 under a theory of respondeat superior. Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 692-94 (1978). However, if it is established that an agent of the municipality, such as a police officer, has violated an individual's constitutional rights, then, in certain circumstances, the municipality itself can be held liable if there was an actionable failure to train. See Watkins v. City of Battle

Creek, 273 F.3d 682, 687 (6th Cir. 2001). To succeed, a plaintiff must prove that: (1) the training was inadequate for the task performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy either was closely related to, or actually caused, the injury. Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006). With regard to the second prong, the Sixth Circuit has identified two situations that would justify a conclusion of deliberate indifference. One is a failure to act in response to repeated complaints of constitutional violations. Brown v. Shaner, 172 F.3d 927, 931 (6th Cir. 1999). The other, argued here by Plaintiff, is a "failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." Id. Specifically, it was predictable that the Indian Hill Rangers would violate the Fourth Amendment rights of individuals detained in their own homes by using excessive force in the application of handcuffs.

The Court believes this claim survives summary judgment under Gregory v. City of Louisville, 444 F.3d 725, 753-54 (6th Cir. 2006), but barely. Officers Lang, Manning and Cogliano testified that there was no policy or procedure that dictated when to place handcuffs on an individual, whether involved in a domestic dispute or otherwise (Lang dep. at 23-24; Manning dep.

at 31-32, 65; Cogliano dep. at 25-26).  All three also testified that it boils down to an assessment of the totality of the circumstances, with officer safety being the primary concern (Lang dep. at 10, 24, 27; Manning dep. at 70-71; Cogliano dep. at 26-28, 31-32).  Officer Cogliano made a passing reference to his "initial training with the Hamilton County Sheriff's Department" (Cogliano dep. at 31), but neither he nor Officers Manning or Lang testified about any training received at the behest of Indian Hill concerning excessive use of force in domestic matters, and it is seemingly absent from the list of courses attended by the Rangers in 2011 (see Manning dep. Exh. 5 at 5 (PAGEID#198)).  On this record, then, the Court has no choice but to deny Defendant Indian Hill's motion at this stage of the litigation.

## IV.  Conclusion

In summary, Defendants Village of Indian Hill and Officer Keith Lang's Motion for Summary Judgment is hereby **GRANTED as to COUNT ONE** (unlawful search) of the Complaint, but **DENIED as to COUNT TWO** (unlawful seizure and use of excessive force). Previously this Court vacated the final pretrial conference and trial settings pending our decision on the instant motion (see doc. 36).  Accordingly, this matter is reset for a **final pretrial conference on September 18, 2014 at 2:00 p.m.**, with a

**three-day jury trial scheduled for October 21, 2014**, on an on-

deck basis.

      SO ORDERED.

Dated:  August 14, 2014     s/S. Arthur Spiegel_____
                                   S. Arthur Spiegel
                                   United States Senior District Judge